Arguments not to exceed 30 minutes per side, Ms. Barnhart you may proceed for the appellate. May it please the court, my name is Erin Gallagher Barnhart, I represent Petitioner Appellant Rick Bays, and I would like to reserve five minutes for rebuttal. This court should reverse the district court's determinations on Bays' involuntary confession claim and his lethal injection claims. Unless the court has a different preference, I will address these arguments in order. And I am also happy to address any questions concerning the renewed motion to expand the First, on the involuntary confession claim, this court should reverse the district court and remand for a de novo review of the evidence, because the Ohio Supreme Court both incorrectly applied the governing legal standard and also unreasonably determined the facts. First, the legal error under section D1 of 2254, the Ohio Supreme Court's decision was contrary to or an unreasonable application of the clearly established federal law that analysis of an involuntary confession claim. While the Ohio Supreme Court stated the proper standard, it failed to actually evaluate the circumstances in totality. Instead, it bifurcated its analysis and considered whether the detective made Bays a promise of leniency in isolation from consideration of other factors in the totality analysis, and in particular, most importantly, Bays' intellectual limitations. In that totality analysis, should any particular factor be prioritized in the evaluative process over any others? What should we, in analyzing that approach, should there be any priority? I don't believe that the governing standard specifies priority. Like any sort of cumulative analysis, factors are to be weighed together, and I think perhaps the weight depends on the circumstances. For instance, if there was very strong evidence of physical coercion or something like that, perhaps lesser evidence would be required of a defendant's intellectual limitations or that sort of thing. I think it all sort of depends on, much like in assessing a death penalty itself, you're sort of weighing the aggravating and mitigating circumstances here, you're weighing the factors that are in favor of voluntariness against those that are not. In this case, there is a very strong factor weighing against voluntariness, and that is Mr. Bays' intellectual limitations. As the Ohio Supreme Court discussed in the first section of his analysis, he has low IQ scores, he suffered from head injuries and brain damage, and so it did recognize those factors and conduct sort of a partial totality analysis. However, at that point it concluded and said, we find that his confession was voluntary, and then in a separate analysis said, now, in isolation, let's look at whether there were implied promises of leniency. In that discussion, the court made both a factual and legal error. Legally, the court failed to consider, well, would someone like the defendant with his mentality and his lack of experience with felony convictions and this type of interrogation have interpreted these statements to imply a promise of leniency? And then factually, the court erred by saying that all the detective did was state other possible penalties, but that's unreasonable as a matter of fact, because that's not all the defendant said, I'm sorry, not all the detective said. In context, the detective said to Mr. Bays, look, we know you did this, and these facts are, they're looking like a death penalty crime. Now there's other ways that murders can be classified. They can be aggravated murder, straight murder, they can even be manslaughter. And in combination with some yelling, some hitting on the table, misleading the defendant about the strength of the evidence against him, combined with someone whose mentality is that of an elementary school student, it's simply unreasonable to conclude that all the defendant did was in isolation list some penalties. What the defendant did was say, things are looking pretty bad for you, you better cooperate because instead of the electric chair, there are other options available. But the Ohio Supreme Court didn't undertake that analysis. And so in that regard, there's both the legal failure to properly apply the totality governing standard and the factual error in determining that this statement was made in isolation when it wasn't, and in determining that this statement wouldn't have implied leniency. Well, I mean, as far as the statement goes, I mean, I have in front of me, it seems, I understand your point about the totality, so I'm not speaking to that right now, but it seems to be a pretty straightforward and accurate recitation of the potential penalties that he would face for homicide. I said a death penalty is obviously that, whatever, that's a bad place to pick up. He said aggravated murder is 20 years or 30 years or life. Straight murder is 15 to life. You've got a possible parole after eight years. Manslaughter and involuntary manslaughter have different penalties, too. I mean, if all that stuff is accurate, I don't really see how that's any promise of leniency. It's just, you know, here are the things that could happen to you. You might want to think about them. True, but they're all things that could happen in the factual context that was facing the defendant. So the detective didn't start talking about penalties for drug possession or DUIs or anything. He was talking about possible penalties that could apply to the facts of the investigation he was conducting. Sure, but that's always going to be true. I mean, if we don't let them say what he said here, it would seem like they can never talk about the potential penalties for particular conduct that they're investigating. Well, I guess I would say, I mean, we're not asking for some per se rule that a detective can never talk about possible penalties. We're asking that under the legal standard of totality that the state court was unreasonable for not analyzing what that statement, even if true, how it would have been interpreted by someone in the defendant's position who lacks sophistication, who has, you know, a child-like understanding. And in that situation, I can't come up with a reasonable explanation for just stating these facts that doesn't involve some sort of inducement, encouragement to cooperate to get the benefit of these lower penalties. And it's not just me who says that. The state's own detectives, Detective Donahue, testified in the suppression hearing pretrial that he interpreted his partner's statements as, if Bays wanted some leniency, it would be in his best interest to make a statement. And that if Bays wanted any chance of any kind of cooperation from the prosecutor's office or whatever, he had better start cooperating with us. Sorry, who said that? That was Detective Donahue. It's at record 152-1. But again, I mean, it's not really what this says, at least as the particular testimony I'm looking at here. Is there any Supreme Court case remotely like these facts that would have made clear to a reasonable state jurist that this should be construed as something akin to an implied promise of leniency? Well, there certainly are quite a few Supreme Court cases that talk about implied promises of leniency, about concerns about, you know, the effect on someone's spouse or relatives. And I just want to clarify that, you know, the kind of the first step in the analysis isn't what the Ohio Supreme Court should have concluded. It's what legal standards should they have applied. Well, they did purport to apply a totality test. They said that. They did say it, but then in their analysis, they didn't. I mean, they did a partial totality that left out leniency, and then they did leniency in isolation. So, you know, the basis argument here is that having shown that the Ohio Supreme Court did not apply the proper legal standard, he then is outside of it. You think they misapplied it, is what you think. It's not, I mean, they didn't get the standard wrong, but you're saying they did it wrong. They misapplied it. Maybe they had, you know, I mean, you could read the opinion potentially to imply that they're bringing forward the prior discussion into the specific analysis of the putative leniency business. You know, I don't, I mean, we can only go by what the court said in its opinion. And there's a clear demarcation between a conclusion about the voluntariness, and then the next paragraph is, however, let's look at leniency. So, I think it's hard to say that that really is considering everything together. And to go back a bit, I think what you're maybe getting to is whether this is contrary to or an unreasonable application. Well, I mean, as you know, the closer a Supreme Court case comes factually to a matter before a state court, the less latitude the state court has. You know, if it's an argument about my trial was fundamentally unfair, and that's the only standard they're citing in its particular piece of evidence, that the state is probably going to have more latitude there. I mean, reasonable jurors have more room, probably. Not always, but you don't always need some close case. But, you know, whereas if you have a case that's pretty darn close factually, then, you know, it's like how, you know, the state court should have known that this fact pattern impinged on this right. And I guess just, I mean, one thing that occurred to me in reading the briefs was that there didn't seem to be any Supreme Court cases factually in the neighborhood. There were just the more sort of settled standards and then Sixth Circuit or other precedent kind of filling in. Yes, so I want to be clear again. The factual similarities that we're matching up are not the facts of, you know, his age, mentality, what was said. They're the facts of you have a bunch of different factors and you're supposed to apply a totality test. So let me offer you for that one of this court's cases, Castleberry versus Bergano. You know, we can't, I mean, unless it's a habeas case. It is a habeas case. Because, you know, we get reversed like instantly if we just say. Certainly, certainly. So, but in this habeas case, it's 349 F. 3rd, 286. What was the name again? Castleberry versus Bergano. It's from 2013. So here, this court was assessing the state court's application of the Kyle's test, so materiality. Another type of totality cumulative test. Brady type claim. Yes, exactly. And what this court held was that the state court's decision was contrary to the Supreme Court's decision in Kyle's. Because they made an item by item determination of materiality instead of considering it together. So I think that's pretty much exactly the same sort of legal error that we're talking about here. Not properly applying a totality test. And then once that conclusion is reached, of course, the federal court is not bound by the state court record. It is to conduct a de novo review to determine the ultimate question of voluntariness. And there's a lot more evidence that goes into that de novo review than was before the Supreme Court in this direct appeal opinion. Sorry, you just lost me there. Sure. How are we considering evidence that was not? Is this collateral review stuff in the Ohio courts? There's both stuff in the state post-conviction proceeding, as well as evidence presented in federal court at an evidentiary hearing. And as far as getting outside of pinholsters restrictions, that's where we are here. So in the state post-conviction proceedings, the defendant's wife testified strongly about the coercion the detective applied to her and to her husband. At his insistence, she specifically told Mr. Bays to just say he did it, that there was a lot of forceful language used. In addition, there was testimony from the defendant's stepson that he had been smoking crack cocaine right before he confessed. And there's testimony from Dr. Smith in the state post-conviction proceedings and also from experts in the federal evidentiary proceedings about how that substance abuse would impair his judgment, would magnify his intellectual limitations, make him much more susceptible to influences. So in the ultimate question, the federal court is to look to all of those considerations as well. And again, there's much stronger evidence about Mr. Bays' intellectual limitations as well that have been offered in the federal evidentiary hearing and, of course, in the proposed intellectual disability claims. I want to, before you exhaust your time, go to the second part of your argument, if this is a good time to transition. Sure. Yes, I want to know whether in this case, on the method of execution, whether it is controlled by our Camel case, where we held that even if the method of execution is unconstitutional, a prisoner can't challenge it in the habeas petition. Does Camel control this case? And if not, why not? It does not for three separate reasons. The first, Camel was not a decision on the merits. It was simply a decision on a motion to remand and a permission to proceed as a second or successive application. And this court has held that those aren't merits determinations. Number two, as this court recognizes, one panel cannot overrule a prior panel. And that's what Camel purported to do with the Adams panel. Now, there's sort of two reasons why it couldn't do that. One, Camel characterized Adams holding as mere dicta. But that's really not a fair characterization. The Adams panel was rejecting the method of execution claims for two separate reasons. One was procedural default, and one was on the merits. So it's really not fair to say that both and neither were necessary to the holding. It just as easily could have been the procedural default decision that was dicta under this characterization. So the warden argued the cognizability question. It was squarely presented. And the Adams panel needed to decide that before it reached its merits determination. So it's not dicta. In addition, the Camel panel said that the Supreme Court's decision in Glossip was intervening law that allowed it to depart from Adams. That also, I think, is inaccurate. Number one, what Glossop said was actually dicta there. Glossop, in an offhand remark, said that method of execution claims must be brought in 1983. But this wasn't a habeas claim in front of it. It was a 1983 case in front of it. So there was no question about cognizability there. In addition, Glossop mischaracterized the Hill Supreme Court case that it was purporting to say held this. How do we revisit any of this, though? Supreme Court characterization, characterization in a published Sixth Circuit case, you know, about whether Glossop is superseding authority. I mean, we can't revisit those things. I think this panel can say that it's not bound to follow Campbell when Campbell illegitimately purported to overrule a prior panel decision. That it thought was dictum, an aspect of it. Right, but for the reasons I just explained, wasn't actually dictum. But, I mean, you know, we're not going to revisit the Supreme Court's characterization in Glossop of some Hill case or something, right? This Court isn't bound by dictum in Supreme Court cases. It's bound only by its holding, and so what Glossop. At our peril, we're not bound, you know. I'm sorry? At our peril, correct. And then for a third reason, Campbell did not address Mr. Bays' statutory claim. It talked only about the constitutional claims. And so that area has not, there's no holding on that at all. And so at a minimum, Mr. Bays should be able, those claims are cognizable. You're talking about Mr. Bays' statutory claim? Yes. Yes. I could discuss more questions about the method of execution claim, or with the clerk's indulgence in the time I have left, I could talk about our motion to renew our COA application. Refer to the presiding judge. Well, I mean, I will just insert a question in that. Sure. I think one of the things that, when I look at this case, I'm going, how are we administratively handling these cases in which, and how do we administratively handle them in a situation where we're deciding these cases one by one, and yet Mr. Bays is hardly the only individual who is going to say, I want 2254 to be the vehicle by which I assert claims which have really been raised as Section 1983 claims, and they involve essentially the method of execution, which, you know, we're talking in this era about lethal injection. We're talking about constitutionality. We're talking about constitutionality of particular drugs as to groups. We're talking about constitutionality as to particular individuals, sometimes because they're alleged to have particular physical conditions that would affect the defendant or the plaintiff, whichever time or whatever context we're in. I mean, what are we going to do about, administratively about saying, this is how, as a court, we're going to handle these? You got any thoughts there? Well, I think the first thought is that instead of making, purporting to make law like the Henry Tibbetts and the Campbell panels did without oral argument, just on a motion to remand, the proper way to do it is, you know, in a case like this where there's full briefing and argument about it. The other is that, you know, and I can go into a lot of this. We actually had an oral argument before the magistrate judge. Ms. Leekland and I both did several years ago about the cognizability of habeas in 1983 for method of execution claims. Briefly, they're different claims. There's different type of relief sought. There's a long history in the federal courts and the U.S. Supreme Courts of recognizing that these types of claims can and should be brought in habeas, and only recently in Nelson and in Hill did the Supreme Court allow certain types of claims that didn't get to the core of the habeas concerns of, you know, the fact or duration of someone's sentence, did they first allow them to be brought in 1983. It used to be sort of everyone understood they could be brought in habeas. The question is can they also be brought in 1983. I just feel like we've been, you know, the last number of years in the Ohio cases, we've just been swimming and not getting to the other shore. I think the district judges would probably agree with you about that. I mean, that's kind of the nature of habeas. Unlike 1983 where everyone's joined into one consolidated case, habeas claims are individual. Well, I mean, they have been brought that way, but they don't have to be brought that way. They don't have to be brought in habeas at all? No, no, they don't have to be. We don't have to have Section 1983 class actions. Yes. Now, the lethal injection case is not a class action. It's simply consolidated. But that's right. I think just for judicial reasons. Well, class action was obviously just a misnomer. Well, but in your case, what I meant to say was we have a whole lot of plaintiffs in the case. We do, yes. And I know that Magistrate Judge Merz has expressed frustration with the pace of that case too because things, you know, he would like it to go to trial, but things instead are characterized as the merry-go-round because there's just one preliminary injunction hearing after another that's on a very compressed. To say, I mean, what you see is a sort of, is court sort of behaving in a circular fashion. And, you know, it's not static because it may not be the same drugs. That's true. The protocol has changed many times. Then there are all the differential things that might arise from particular aspects of a particular individual's physical state or whatever it is. I mean, I'm not sure that some kind of more simple, that a more organized form of handling all of this can emerge from this case. I'm merely, I guess I'm not sure whether this is frustration or what. Yes. Well, I mean, I share the frustration. There's been ongoing discussions in the 1983 case about how dissatisfied the judge and at least the plaintiffs are at the way things are handled. But, you know, the governor is a defendant in that case. The governor sets the pace of executions. And it's not something that plaintiffs or the court can control. But that doesn't change the fact that whatever the situation in 1983, Mr. Bays has the right to bring his claims in habeas and should be able to do so. And as I've mentioned, you know, I think the district court erred in holding that they weren't cognizable. And this court isn't bound by the Campbell's panel suggestion that they aren't. And I see my time is up. So unless there's further questions, I'll reserve my time for rebuttal. Thank you.  Thank you. Sorry, I'm battling a cough that I've had for a couple of weeks, so I will try not to choke my way through this. May it please the court, my name is Brenda Wikula, and I represent the warden in this case. The district court correctly decided both issues that have been briefed for argument today. The district court effectively did a de novo review,  the magistrate judge did defer to the Ohio Supreme Court, and then essentially did a de novo review himself. And every judge that... Are you talking about the confession issue right now? Yes. As to the confession issue. The magistrate judge in his review of the Ohio Supreme Court went through all of the evidence individually himself as well. Every judge that has looked at this, be the state court judges, and up until this point the federal judges, have all found that Mr. Bay's confession was voluntary. There was no promises of leniency. The fact that the officers told Mr. Bay's, these are the possible penalties for different types of murder, that's not a promise of leniency. The fact that he is told, hey, it's better to tell the truth, it's always better to tell the truth. I mean, I tell my 11-year-old it's a lot better to tell the truth than a lie. In this case, what was the... What was the purpose of the detective making the statement and reciting the lesser penalties, if not to suggest to this person with limited mental capacity or whatever, that if you don't cooperate, then you're looking at murder and the death penalty. I mean, wasn't that the implied message, that if you confess and do this, then you can possibly escape the death penalty? Isn't that what that was about? Well, respectfully, no, Your Honor. First of all, it was a possibility. And in saying no, do we assess this from the perspective of the speaker or the hearer? Your Honor, I believe that the Miranda rule is from the speaker. The benefit or the problem that Miranda was looking for was to avoid police coercion. And you look at what a reasonable officer would conclude. And in this court's case in Garner, the... This court in Anbanc said it's whether the suspect knew that he could choose not to talk. And that is what the voluntariness is. The promise of leniency, there was none. The fact that he goes through what the penalties are is not a promise of leniency. A possibility of leniency is not a promise of leniency. And there's a difference. And the fact that he goes through, this is what you'll get if it's, you know, death penalty. And I just want to insert that appellate's counsel says that this was not this calm, you know, reasoned air where two people are conversing and going through this. She says there's yelling, there's in-your-face, there's banging on the table, there are some things approximating the threat. And so under the scenario that she talked about and given the defendant's capacity, does that in any way impact in this totality analysis how we analyze and evaluate this? Well, Your Honor, first to the part of the question about his mental capacity. He advised the officers, he had a 10th grade education. He advised he could read and write. He understood his rights. He had been arrested previously. He, in fact, was read his rights on two different days and expressed that he understood his rights both days. He was there voluntarily. He was not under arrest during either statement. So arguably Miranda wasn't even required to give. He's not in custody for either. He was free to go until after he had confessed to the murder. So the fact that they gave him the Miranda warnings is above and beyond what they were required constitutionally to do. He was free to go up until the time he confessed. And the first interview, they picked him up at his house, said, would you please come down and answer some questions for us. After they got done questioning him, he talked, I believe, to some officers about possibly becoming a CI in some drug cases or giving some information about some drug cases. And then the officers took him home. So when they go back three days later and say, hey, we've got a couple more questions for you. Would you mind coming back down to the station? I believe the officer testified that he went and put his shoes on, went and got a coat. He was not handcuffed. He was not under arrest. He was told he was not under arrest. And it wasn't until after he confessed. Now, both officers testified that while there was some possible raising of voices, there was no yelling at him. There was no threats of him. Certainly in the portion of the interview that was recorded, there was none of that. The interrogation prior to his confession was short in duration. I believe it was 12 minutes from the time he signed his rights waiver to the time that the tape recorder was turned on and he had actually made his confession. The officers testified that they didn't record the beginning of that because if he was just going to deny it as he did the first interview, they were just going to take him home. So the fact of the matter is the fact that they gave him Miranda wasn't even required to be done. And his intellectual ability, again, the relevant constitutional principles are aimed at protecting him not from himself, but protecting him from police coercion. And the police did nothing in this case to coerce a confession. The police told them, look, this is what we think happened. This is the evidence that we have. And the fact that they may have indulged the evidence that they have is also not improper. They may have indulged the evidence that they may have. They let him know that they had fibers that matched him and things. So they didn't have that evidence yet. But the fact that a defendant's will is not overborne simply because he's led to believe that the government has more knowledge than they do, that comes from this court's case in Ledletter v. Edwards, 35F3D 1062. That was a 1994 case out of this court. So his will's not overborne here by the fact that the police are like, this is what we think happened. This is what evidence that we have found. Is that how it happened? And then he starts saying, no, it's not. And the officers testified that they're like, come on, this is the evidence that we have. And then he finally admits that, yes, it happened exactly the way you said it happened. In fact, he then goes, gives his taped confession, and they get a videotape and they have him demonstrate on one of the officers how he committed the murder. There is no coercion. There is no promise of leniency here. He is voluntarily, very calmly, the officers testified he was not acting nervous. He was acting calm. He is in his mid-20s. It was a short interview. He was not deprived of any food or water. There's no evidence of anything that he had been there for days or any will being overborne. Again, the officers already had strong evidence against him. And so the fact that they told him that and he eventually admitted to it, that doesn't show that that actually implies and the record establishes that this is a completely voluntary confession. And, again, every... I want to go back, and I understand that part of your argument, but I just want to go back and confirm that. So you're saying that Detective Donahue did not testify that he understood Detective Savage to be telling Bays that it was in Bays' best interest to cooperate and that if he did, Bays might get some leniency. You didn't read the transcript and come to that and interpret that testimony that way? Your Honor, I did read the transcript. I don't interpret it the exact same way. Detective Donahue, that was a question, I believe, on Cross. And in Cross, the defense attorney said, could that be interpreted as being leniency? Or what do you interpret that? Was that possible? And he says it's possible, but again, possible is not promise. I mean, it's possible I will let my son stay up until midnight playing video games. It's highly improbable. So the standard is promise of leniency, not maybe this is what could happen. I don't have the page ID written here, but I'll go back and check it. Thank you. Do you need the page ID for the... Okay. What's your response to Ms. Barnhart's point that Campbell should not be binding because of the procedural posture of that case? Your Honor, I completely disagree with that. What are the reasons for your disagreement? Your Honor, the procedural posture of Campbell being a successive petition really should have no difference as to the underlying claim of whether lethal injection should be litigated in Habeas versus 1983. It has benefited petitioners for years to be litigating this in both cases. Because it has completely mucked up the system as Judge Gibbons kind of implied. These cases are meandering along the river, never reaching the bank. And that's been by design because if they've got cases going in both Habeas and 1983, the courts don't know where these claims belong. And I think Campbell, from the language of the Campbell decision, the panel was saying, look, we are trying to give you the direction that we have been trying to give you in all of these other cases we've decided. And district courts, get on the program. This is where they belong. They belong in 1983. Habeas is for things that would completely invalidate the sentence. And the validity of Bayes' sentence is not dependent on the method of execution. In fact, Ohio revised code 2949.22c provides for an execution by a different method in the event that lethal injection is found unconstitutional. So in Ohio, the method of execution is not, or his sentence is not dependent on what method of execution. And therefore, by definition, it belongs in 1983. I was the author of Campbell. It didn't have a super high procedural profile at that time. It was not argued. I'm not sure that it doesn't make more sense than I thought it did. You may be making it look better than it looked in my own eyes. But we'll figure all that out. It was per curiam, so you healed yourself. Well, I'd forgotten it was a per curiam. I forgot you were on the panel. I knew you were on the panel. I did not know you were the author. I wasn't. I don't know. I thought I was the author. It might have been Judge McKee. You kind of read like him a little bit. I'll think of more. I'm sorry. Go ahead. Now that I've managed to embarrass myself. I think the question was, is it distinguishable? The answer is no. His sentence is not dependent on what method of execution is used. Therefore, the claims are proper to be brought in 1983 and not in habeas. For these reasons, I believe that the district court's decision should be upheld. Unless there are no further questions, I will sit down. Well, in case you're interested, it appears that I'm identified as the author. Okay. If there are no further questions, I will be done. On rebuttal, I'd like to address both the involuntary confession and lethal injection. Two points on involuntary confession. First, the district court did not do a de novo review. It never said it was doing a de novo review on the involuntary confession. It never found the state court's decision unreasonable under 2254D that would allow it to do a de novo review. And even if it silently attempted to do a de novo review, it did not consider all of the relevant evidence. And so it was not a proper de novo review. More broadly, I would submit that we should be very concerned that this confession was a false confession that resulted in Mr. Bay's wrongful conviction. There are very unusual circumstances that led to this confession. I'm going to share pages 10 and 11 of that transcript, record Detective Savage testifying about how this confession came about. He received a phone call from a source who has never been disclosed, who knew intricate details that had not been released to the public about the murder. Defective Savage testifies that he learned this information from this anonymous source, then told Mr. Bay's, somebody who is worried about the safety of himself and his family, about being in trouble, who is under the influence of crack cocaine, quote, I told Mr. Bay's that he went into Mr. Weaver's house, that he struck him in the head with a battery charger, that he then struck him in the head with a cassette player, he slashed his throat, he stabbed him in the chest, that he took his wallet. And then immediately after leaving, I told Mr. Bay's he ran east to buy some crack and that another individual had seen him there with a bullet on his shirt. I told Mr. Bay's that he then went home and he was observed placing a glove, a T-shirt and a wallet into the sewer. He goes through, in this 10 minute time period, goes through all of those things and then says to Mr. Bay's, you did it, right? And Mr. Bay's says, yeah, I did it. And he says, okay, confess. The confession is just Mr. Bay's repeating back what the detectives had told us. Often in wrongful conviction cases, we're worried about detectives accidentally leaking information to a defendant. We don't have to worry about that here. The detective testifies. He told him everything that he recited back. If you read the confession, most of Mr. Bay's answers are yes, yes or no. That's a hallmark of intellectual disability where somebody can't provide specific details themselves. They just sort of agree so that they appear more competent than they are, that they like to please authority figures. So we should be very concerned about that. If I can just ask you, did Bay's offer the comments about the victim's wallet? According to the Ohio Supreme Court, Bay's tells Savage that the victim was in his wheelchair the whole time that he saw him, but that he didn't take his wallet out of, the victim did not take his wallet out of his pocket. But he knew it was in his back pocket. Is that something that Bay's volunteered or is that something he affirmed? Detective Savage testified that Bay's provided that information in their first interview on the 16th, not on the 19th. And I believe he says Mr. Bay's volunteers it. The reason why I don't think it's that probative is that Mr. Bay's knew Mr. Weaver. He'd been there plenty of times. The fact that Mr. Weaver kept his pretty distinctive wallet in his back pocket was something that Bay's would just know anyway. It's not evident that he knew it from that particular day. So that's why I don't think that's important. Judge Gibbons, you were asking about when Detective Donahue stated that he found the promises where they were implied promises of leniency. That's on page 50 and 51 of the suppression hearing transcript. It was on cross-examination, but Detective Donahue says in his own words, it meant that if he wanted any chance of any kind of cooperation from the prosecutor's office or whatever, he'd better start cooperating with us. Then Mr. Bay's attorney says, so if he wanted some leniency, it would be in his best interest to make a statement. And Detective Donahue says, that's, I suppose, a fair statement. Turning quickly in the time I have left to lethal injection, I would just like to respond to two points. The idea that it's by design that this system is convoluted I don't think is a fair characterization. The reason why it's been so convoluted is that the warden vigorously contested every attempt by Mr. Bay's to amend his petition with lethal injections every time that the state changed the protocol. Mr. Bay's doesn't have any control over those facts. And instead of allowing him to amend and proceeding to a decision, it was tied up in reports and recommendations and objections and supplemental reports and recommendations. Again, that was all the warden's doing. That's not Bay's' doing. And finally, the idea that Ohio could enact a different method of execution doesn't defeat habeas jurisdiction. Ohio could abolish the death penalty, but that doesn't mean that every habeas case right now from an inmate on Ohio's death row isn't cognizable in habeas. A future change to jurisdiction isn't what matters to habeas. What matters is what's legal, what's available to the state at the moment. So I think there is a strong argument that it is cognizable in habeas. I see my time is up. I would just simply, in addition to those two issues, encourage the court to please look carefully at our motion to reconsider the certificate of appealability on issues that I think are very crucial and important in the heart of this case. Thank you. Well, we appreciate very much your argument. We'll consider the case carefully. All 2254 cases are difficult, but this one has some sort of repercussions beyond this case with respect to Campbell and what the going forward posture is going to be. And we'll give it our best attention. Thank you all. I believe we can adjourn court.